## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number: **11-06474-jw**

### ORDER SUSTAINING OBJECTION TO CONFIRMATION

The relief set forth on the following pages, for a total of 12 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**03/07/2012**



*(signature)* John E. Waites
Chief US Bankruptcy Judge
District of South Carolina

Entered: 03/07/2012

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: | C/A No. 11-06474-JW |
| | Chapter 13 |
| Trevor Michael Strever and Sharon Carter Strever, | **ORDER** |
| Debtor(s). | |

This matter comes before the Court upon a continued confirmation hearing on the Chapter 13 plan filed by Debtors. Suntrust Bank ("Suntrust") holds a second mortgage on Debtors' principal residence (the "Property") and objected to Debtors' plan, in which Debtors moved to value Suntrust's mortgage at zero. Following consideration of the pleadings, the evidence presented, and the arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, which is made applicable to this matter under Federal Rules of Bankruptcy Procedure 7052 and 9014(c).

**FINDINGS OF FACT**

1. Debtors filed a petition for relief under Chapter 13, as well as their schedules and statements, on October 19, 2011. In their Schedule A, Debtors listed $110,000.00 as the value of their principal residence (the "Property").

2. GMAC Mortgage ("GMAC") is the holder of a first mortgage on the Property. Debtors' Schedule D listed GMAC's claim at $127,694.95.

3. Suntrust holds a second mortgage on the Property. Debtors' Schedule D listed Suntrust's claim at $24,625.00.

1

4. Debtors filed a Chapter 13 plan, which includes a motion to value Debtors' interest in the property under 11 U.S.C. § 506 at $110,000.00 and to value Suntrust's lien at zero and avoid it pursuant to 11 U.S.C. § 506(d).

5. Suntrust objected to confirmation of Debtors' plan, contending that the Property was worth more than the amount of GMAC's mortgage. Relying on 11 U.S.C. § 1322(b)(2), Suntrust asserted that because its mortgage is partially secured, Debtor is not permitted to strip off or void Suntrust's lien.

6. At the confirmation hearing, the parties did not stipulate as to the amount of the first mortgage and GMAC had not filed a proof of claim at the time of the hearing. Mr. Strever testified that the amount of the first mortgage was around $129,000.00. He also testified that he had tried to sell his home within the last couple of years, but was unsuccessful and was of the opinion that a sales price of $110,000.00 was unlikely. Mr. Strever did not state the price at which he previously listed the Property. He did state that the Property's value was negatively affected because part of the back of a warehouse could be viewed from the front yard of the Property.

7. Each party called an appraiser to testify at the confirmation hearing. The appraisers were qualified as experts in the field of residential home appraisals without objection and both submitted written appraisals of the Property which reflected their opinion of its value.[1] To estimate the Property's value, both appraisers used the "sales comparison approach," whereby the sales prices of three homes that recently sold were adjusted to reflect the differences between those homes and Debtors' Property. The adjusted sales prices were then averaged to estimate the Property's market value.

---

[1] Both appraisals were submitted into evidence without objection.

2

8.  Under the sales comparison approach, Debtors' appraiser, Ms. Careyann Clamens, estimated the Property's value to be $105,000.00 as of November 8, 2011. In making this conclusion, Ms. Clamens compared the price of three recent sales of homes that in her view were similar in location, size, and condition to Debtors' Property. Two of the sales used were foreclosure sales[2] and the third was labeled as an "arm's length" transaction. Ms. Clamens testified that appraisers did not use foreclosure sales in the past to estimate value, but that because foreclosures had become so commonplace, it was appropriate to use them in current market valuations. On cross examination, Ms. Clamens opined that foreclosures satisfied the definition of market value as the term was defined in her appraisal.[3]

9.  Also using the sales comparison approach, Suntrust's appraiser, Mr. Mark Brown, testified as to his opinion that the value of the Property was $136,000.00 as of October 19, 2011.[4] In conducting his appraisal, Mr. Brown also used the sales price of three properties that he viewed as having a similar location, size, and condition to the Property. All of the sales used in Mr. Brown's appraisal were arm's length transactions, as it was his opinion that foreclosures did not provide an accurate estimate of market value. This was because he found that banks tended

---

[2] For the purposes of this Order, the Court will refer to all types of distressed sales, including trustee's sales, sales of bank owned properties (i.e. "REOs"), as well as short sales as "foreclosures" or "foreclosure sales."

[3] Both appraisals defined market value as:
> [T]he most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

[4] Mr. Brown stated that he was a member of the Appraisal Institute, which had designated him as SRA,[4] whereas Ms. Clamens was not a member of the Appraisal Institute and had no such designation. According to Mr. Brown, this membership and the SRA designation were both highly regarded in the appraisal business. An SRA designation is a professional designation awarded by the Appraisal Institute to appraisers meeting certain education and experience requirements.

to "dump" properties quickly in order to avoid owning a large number of properties and that therefore, a bank was not a "typically motivated" seller as required by the definition of market value. Mr. Brown also testified that property values were stabilizing in the Beaufort area. In critiquing Ms. Clamens' appraisal, Mr. Brown testified that her Comparable Sale No. 1, which was valued significantly lower than other properties, was located on a new five-lane highway and was sold while that highway was under construction. He further testified that the home's location on the highway had a very negative effect on the home's value, and that a positive adjustment to the sales price should have been made to reflect this fact. No such adjustment was made.

## ISSUE

To what extent should comparables based upon sales of distressed real properties be relied upon for valuation of real property under 11 U.S.C. §§ 506 and 1322(b)(2) when a debtor intends to retain the property in a Chapter 13 case?

## CONCLUSIONS OF LAW

11 U.S.C. § 1322(b)(2)[5] provides that a debtor can "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence." This Court, as well as the majority of circuit courts of appeals, has held that a security interest in a debtor's principal residence can be avoided in a Chapter 13 case if that interest is wholly unsecured. In re Godwin, C/A No. 05-08244-JW, slip op. at 3 (Bankr. D.S.C. Oct. 12, 2005); see also Fisette v. Keller (In re Fisette), 455 B.R. 177, 182 (B.A.P. 8th Cir. 2011) (holding that "§ 1322(b)(2) does not bar a Chapter 13 debtor from stripping off a wholly unsecured lien on his principal residence" and citing supporting case law from the Second, Third, Fifth, Sixth, Ninth, and Eleventh Circuit Courts of Appeals as well as the

---

[5] Further references to the Bankruptcy Code shall be by section number only.

4

Bankruptcy Appellate Panels of the First and Tenth Circuits) (citations omitted). In order to determine whether a junior lienholder is wholly unsecured, the Court must first establish the value of senior claims as well as the value of the underlying collateral.

For the purposes of Suntrust's Objection, this Court finds that GMAC holds a first mortgage on the Property in the amount of $129,000.00. GMAC has not filed a proof of claim in this case that indicates the amount of its lien, and Debtors and Suntrust did not stipulate as to the amount of GMAC's claim. Mr. Strever testified that he owed approximately $129,000.00 on GMAC's mortgage, and Suntrust did not dispute this assertion. Therefore, if the Court finds that the Property's value at the time of the hearing is below $129,000.00, Debtors may strip off or avoid Suntrust's lien, whereas if the Court finds that the Property's value is over $129,000.00, § 1322(b)(2) prevents an avoidance of the lien.

## I. Determination of Secured Status Under § 506(a)(1)

Section 506 governs the extent to which a claim is secured and how a secured creditor's collateral is to be valued. For the valuation of real property, § 506(a)(1)[6] instructs that "such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." See, e.g., Alvis v. Fox Valley Credit Union (In re Alvis), No. 10-B-17861, Adv. No. 10-A-01268, 2011 WL 1348219, at *1–*2 (Bankr. N.D. Ill. Apr. 7, 2011) (using § 506(a)(1) to determine how to value real property for purposes of § 1322(b)(2)). When a principal residence serves as the underlying collateral, a second mortgage may be

---

[6] Congress made clear that § 506(a)(1) was to govern the valuation of real property when § 506(a)(2) was added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Pub. L. No. 109-8, 119 Stat. 23 (2005). Section § 506(a)(2) provides that if the debtor is an individual under Chapter 7 or 13, the value of collateral that is personal property "shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale and marketing." Therefore, by implication, § 506(a)(1) governs the valuation of real property.

5

stripped off if the total amount of all superior liens exceed the value of the property after its value is established under § 506(a)(1).

## II.     Foreclosures and the Valuation of Real Property Under § 506(a)(1)

Given that § 506(a)(1) states that value is to be determined in light "of the proposed disposition or use of such property," a debtor's proposed use of the real property at issue must be analyzed to determine its value. A number of courts have held that when a debtor intends to retain a principal residence, the property is to be valued at its fair market value by comparing similar arm's length transactions and without relying on any foreclosure sales.[7]

These holdings appear consistent with the United States Supreme Court's decision in Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 117 S. Ct. 1879, 138 L. Ed. 2d 148 (1997). In Rash, the Court found that given the "proposed disposition or use" language in § 506(a), the actual proposed disposition or use of the collateral at issue was of "paramount importance to the valuation question." Id. at 954, 117 S. Ct. at 1881. Therefore, when a debtor proposes to surrender collateral to a creditor, his motivation is to release his possession and a foreclosure value is the appropriate guide. See McElwee v. Adams Cnty. Nat'l Bank (In re McElwee), 449 B.R. 669, 674 (Bankr. M.D. Penn. 2011) ("Generally, when the collateral is surrendered to a secured creditor . . . a liquidation value, also referred to as a foreclosure value—rather than fair market value, is utilized.")

---

[7] See In re Balaoing, No. 11-52030-ASW, 2011 WL 5885784, at *4 (Bankr. N.D. Cal. Nov. 22, 2011) ("When the debtors intend to stay in their house, the proper valuation of the house under Bankruptcy Code section 506(a) is the fair market value. . . . The fair market value is not the 'replacement' value because the house is not being replaced. Neither is it the 'foreclosure' value because no foreclosure is intended in the chapter 13 plan.") (citing Taffi v. United States (In re Taffi), 96 F.3d 1190, 1192 (9th Cir. 1996)); In re Alvis, 2011 WL 1348219, at *2 ("Since the Debtors apparently intend through their plan to keep the Property, '[t]hat actual use, rather than a foreclosure sale that will not take place, is the proper guide.'") (quoting Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 963, 117 S. Ct. 1879, 1886, 138 L. Ed. 2d 148 (1997)); In re Duncan, No. 08-8808AJM3, 2008 WL 5333561, at *2 (Bankr. S.D. Ind. Dec. 17, 2008) (finding that for purposes of § 1322(b)(2), "the three (3) sales . . . are not indicative of 'fair market value' because they were distressed sales of bank owned properties that were foreclosures and therefore not determined to be arms-length transactions").

6

A debtor intending to keep his real property finds a higher value in its retention than its surrender and intends to realize its higher value in any disposition. This rationale was well explained by a bankruptcy court in California, where the foreclosure rate is among the highest in the country:

> Generally, an owner-occupant will try to realize the highest and best price for her property in an open market. Conversely, a bank-owned property is marketed to liquidate the bank's inventory of foreclosed properties and minimize the bank's losses in a time of economic stress. . . . The court cannot assume that the bank is a "willing seller under no compulsion to sell." A bank simply does not have the same incentive to market a foreclosed property as patiently as an owner-occupant, or to necessarily realize the highest and best price. . . .
>
> The Debtor argues that the bank-owned properties are part of the overall market and must be considered proportionately in any formula for valuing the Residence. However, that argument assumes that bank-owned properties are marketed the same and tend to attract the same buyers as owner-occupied properties.

In re Serda, 395 B.R. 450, 454–55 (Bankr. E.D. Cal. 2008) (citations omitted).[8]

## III.    Fourth Circuit Case Law on § 506 Valuation

The Fourth Circuit Court of Appeals has addressed the valuation issue in the context of joint Chapter 13 debtors who attempted to avoid a junior deed of trust pursuant to § 506. Coker v. Sovran Equity Mortg. Corp. (In re Coker), 973 F.2d 258 (4th Cir. 1992). In Coker, the debtors intended to retain a piece of real property, and attempted to deduct the costs of a hypothetical sale from the real property's fair market value to support their assertion that the junior lien holder was unsecured. Id. at 259. The Court did not permit the debtors to do so, noting that "the debtors' stated intention to retain the property made the costs of sale truly hypothetical." Id. at 260 (citing Brown and Co. Sec. Corp. v. Balbus (In re Balbus), 933 F.2d 246, 252 (4th Cir.

---

[8] The Court in In re Serda also explained that bank owned properties are often left vacant for an extended period of time, and as a result, often require more repairs than homes owned by individuals. Id. at 455. The Court reasoned that not all buyers are "similarly motivated" and willing to take on such repairs, which would drive down the price of a bank-owned property beyond just the cost of making the necessary repairs. Id.

7

1991)). In closing, the Court provided reasoning that could be readily applied to the situation where a debtor was trying to avoid a second mortgage on a principal residence and use foreclosure sales to determine the property's value:

> [T]he [debtors] want the court to value [the junior lienholder's] claim as if the very event that Chapter 13 permits them to avoid has occurred, i.e., a foreclosure. If [§ 506(a)'s] "proposed use or disposition" provision is to have any meaning, the debtor should not be permitted to "eat with the hounds and run with the hares."

Id. at 260 (citations omitted); see also In re Coates, 180 B.R. 110, 116–17 (Bankr. D.S.C. 1995) ("It appears that the Fourth Circuit in *Balbus* and *Coker* has directed this Court to a standard for valuation based upon the perspective of the proposed *use* of collateral by the debtors and not upon the perspective of the creditor in recovering the collateral.")

## IV.   Standards Applied

Applying these standards, the Court finds that if a Chapter 13 debtor intends to retain a principal residence and is attempting to strip off a second mortgage, then that property's fair market value should be determined without relying on foreclosure sales when evaluating a secured party's status under § 506(a)(1). The fair market value best represents what a principal residence is worth to a debtor because it is the price that the residence would likely sell for in an arm's length transaction.[9] Even after a positive adjustment, foreclosure sales are not the most reliable indication of market value, as it merely estimates how much more the foreclosed property would have sold for in an arm's length transaction between two individuals.

For similar reasons, this Court finds that active listings are not as reliable of an indication of value as arms length sales, as most properties likely sell for below the listing price. Just as it is difficult to adjust foreclosure sales upward, it is also difficult to gauge how much lower than

---

[9] See Black's Law Dictionary (Westlaw 9th ed. 2009) (defining "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an *arm's-length transaction*") (emphasis added).

8

the listing price a given home will sell for. Such a determination seemingly depends on many subjective motivations of the seller that are unknown to an appraiser. See In re Alvis, 2011 WL 1348219, at *3 ("Just like foreclosure sales . . . active listings are suspect as an accurate indicator of fair market value . . . .").

While this Court has previously made a valuation determination where foreclosure sales were equally used by both parties as comparables, see In re Clark, C/A No. 11-04946-JW (Bankr. D.S.C. Dec. 7, 2011), the circumstances of this case have more pointedly raised the issue of the proper degree of reliance on foreclosure sales to determine value under § 506(a)(1).[10] The depressed property values in South Carolina and particularly in Beaufort County have caused this issue to come up repeatedly; therefore, clarification is appropriate. The presence of distressed sale properties on the market, particularly a high volume of them, affects the value of all properties competing for sales. Their presence is likely to lower the asking price for properties being sold in arm's length transactions. Nonetheless, a seller of a foreclosed home is still likely to be motivated to sell for a lower price than a sale between two willing individuals in an arm's length transaction. Additionally, § 506(a)(1) directs the Court to not rely on foreclosures for valuation when a debtor intends to keep his or her principal residence. Comparing the sales of similar homes sold in arm's length transactions between two individuals, adjusted for the material differences from the property being appraised, is the proper way determine a property's market value for the purposes of § 506(a)(1) and § 1322(b)(2).

The Court is aware that real estate valuations "are matters of art more than science." Hildreth v. Hildreth (In re Hildreth), No. 1:09-bk-09029 MDF, Adv. No. 1:10-ap-00158 MDF,

---

[10] The appraisals in In re Clark were made almost three months apart, and this Court determined that the one made later in time was more indicative of the fair market value of the property being appraised in part because there was evidence that this property's value had declined during the time period between the date of the first appraisal and the confirmation hearing. See In re Clark, C/A No. 11-04946-JW, slip op. at 1–3.

9

2011 WL 1332036, at *5 (Bankr. M.D. Pa. Apr. 7, 2011). While both appraisers presented credible testimony and were well qualified experts in the field of residential appraisals, this Court finds that after applying the valuation standards mentioned herein to this case, the appraisal submitted by Mr. Brown is more indicative of the Property's fair market value. Mr. Brown used three arm's length transactions in determining $136,000.00 to be the Property's fair market value, whereas Ms. Clamens used only one arm's length transaction and two foreclosure sales. The arm's length transaction used by Ms. Clamens had an actual sales price of $122,500.00 and an adjusted price of $122,200.00 after adjustments were made for the differences from Debtors' Property.[11] The adjusted price of the arm's length transaction used by Ms. Clamens was higher than the adjusted prices of both of the foreclosures sales that she used in her appraisal. The adjusted values of the foreclosure sales were $76,500.00, and $116,800.00, respectively.

Additionally, Mr. Brown used a price of approximately $45.00 per square foot when making price adjustments based on the size of the comparable homes sold. In comparison, Ms. Clamens used a price of approximately $15.00 per square foot when making the same adjustments. Considering that Mr. Brown valued Debtors' Property at $86.40 per square foot, that Ms. Clamens valued the Property at $62.76 per square foot, and that the lowest price per square foot of any of the comparable sales in either appraisal was $43.43, the Court is of the opinion that Mr. Brown's adjustments based on the size of the comparable sales were more reasonable. If Ms. Clamens had used a value of $45.00 to make value adjustments based on size, the adjusted sales price of the arm's length transaction used in her appraisal would have increased from $122,200.00 to $131,720.00.

---

[11] The average of the three adjusted sales prices in Mr. Brown's appraisal and the adjusted sales price from the arm's length transaction in Ms. Clamens' appraisal is approximately $132,588.00.

The Court also notes that Ms. Clamens' Comparable Sale No. 1 was a foreclosure sale that sold for over $40,000.00 less than both of Ms. Clamens' other comparables. The $76,500.00 adjusted sales price for Comparable Sale No. 1 is almost $30,000.00 less than the $105,000.00 that Ms. Clamens estimates Debtors' Property to be worth. It is also noteworthy that Ms. Clamens' Comparable Sale No. 1 is larger than any of the other homes used in her appraisal or Mr. Brown's appraisal. Additionally, the Court finds convincing Mr. Brown's testimony that based on its selling price and location on a new highway, Ms. Clamens' Comparable No. 1 did not provide an accurate indication of the Property's fair market value. Given these considerations, Ms. Clamen's use of the adjusted sales price of Comparable Sale No. 1 to determine the Property's fair market value appears inappropriate.

In sum, because Debtors propose to keep their residence, this Court determines that the Property's fair market value is over $129,000.00. Consequently, § 1322(b)(2) does not permit Debtors to strip off or avoid Suntrust's lien.

## CONCLUSION

Suntrust's Objection to Confirmation is hereby sustained. Debtors are to file an amended plan within ten days of the entry of this order that provides for the treatment of Suntrust's mortgage balance as secured.

**AND IT IS SO ORDERED.**